**GOLDSTEIN AND PRICE, L.C.,**
Plaintiffs/Appellants,

v.

**TONKIN & MONDL, L.C, and Simon Tonkin, Defendants/Respondents.**

No. 72402.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 16, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 6, 1998.

Application to Transfer Denied Sept. 22, 1998.

Eugene K. Buckley, Evans & Dixon, St. Louis, for appellant.

Joanne Martin Descher, Descher & Schultz, St. Louis, for respondent.

AHRENS, Presiding Judge.

The law firm Goldstein & Price, L.C. ("Goldstein & Price") appeals from a declaratory judgment entered on March 5, 1997 by the Circuit Court of the City of St. Louis. The trial court determined the parties' rights to attorneys' fees arising from contingency fee agreements and interpreted an operating agreement, governing the withdrawal of a member from Goldstein & Price.

Simon Tonkin ("Tonkin") worked as a partner and then member of Goldstein & Price for over seven years. In December, 1989, during his tenure with Goldstein & Price, Tonkin settled a case, filed on behalf of Harold Clark, a towboat engineer, against his employer, Spartan Transportation Company ("Spartan"), to recover for personal injuries. Spartan's underwriter, Neare, Gibbs & Company, insured the loss.

After settlement, an attorney and the head of claims for Neare, Gibbs & Company discussed with Tonkin the possibility of an action for indemnity and contribution against the United States. Tonkin, acting on behalf of Goldstein & Price, agreed to represent Neare, Gibbs & Company & Spartan in an action for indemnity and contribution. Neare, Gibbs & Company and Goldstein & Price entered into a contract, whereby Goldstein & Price agreed to provide representation on a contingent fee basis. They contracted as follows:

> You requested that our firm handle the subrogation action on a contingency fee basis, and we have agreed to do so. The contingency fee will be 1/3 of all monies recovered by judgment or settlement, plus expenses incurred.

Tonkin filed the case ("*Spartan* case") on January 28, 1990 in the United States District Court for the Southern District of Illinois. Tonkin and Douglas Gossow, an associate at Goldstein & Price, principally handled the case on behalf of the firm. Goldstein & Price devoted a total of 421.35 hours to the *Spartan* case. Of the total hours, Tonkin's time spent accounted for 243.25 hours.

On September 23, 1994, the District Court entered judgment against the United States in the amount of $1,471,965.09. Tonkin advised Deborah Sproehnle, a representative of Neare, Gibbs & Company, of the risks involved in an appeal by the United States. Pursuant to Federal Rule of Appellate Procedure 4(a)(1), the United States had sixty (60) days from entry of judgment, to and including November 22, 1994, to file a notice of appeal. On November 22, 1994, Tonkin contacted the Clerk's office and learned the United States filed no notice of appeal.

Goldstein & Price converted from a partnership to a limited liability company in January of 1994. The members of Goldstein & Price adopted their partnership agreement as the company's operating agreement until a new operating agreement, consistent with the limited liability company statute, could be prepared. The members discussed a proposed operating agreement on October 22, 1994. Tonkin had concerns about the proposed operating agreement and requested additional time to review it. Goldstein & Price set up a special evening meeting on November 22, 1994 to address Tonkin's concerns about the proposed operating agreement.

Ten minutes before the meeting, Tonkin advised members of Goldstein & Price that he intended to withdraw from the firm. He provided written notice of withdrawal, claiming an effective withdrawal date of December 31, 1994. Two of the managing members later met to discuss Tonkin's withdrawal. They reviewed Section 12 of the operating agreement that was still controlling.[1] The managing members concluded the operating agreement compelled Tonkin's withdrawal on November 30, 1994. Because of the Thanksgiving Holiday, Goldstein & Price scheduled a meeting on November 28 to discuss the details of the withdrawal with Tonkin and his attorney.

The attorney for the United States in the *Spartan* case, realizing he had miscounted the sixty days, filed a notice of appeal on November 23, 1994.

Goldstein & Price informed Tonkin and his attorney at the November 28, 1994 meeting that the effective date of his withdrawal would be November 30, 1994, pursuant to all members' interpretation of the controlling operating agreement.

After another meeting on November 29, 1994, Tonkin contacted Neare, Gibbs, & Company and offered to continue to represent them and Spartan in the subrogation action. Tonkin supplied a written authorization for use in directing the transfer of the file to his new firm, Tonkin & Mondl, L.C. ("Tonkin & Mondl"). Neare, Gibbs, & Company signed the authorization. On November 30, 1994, Neare, Gibbs & Company instructed Goldstein & Price to transfer the

---

1. Section 12 provides in pertinent part that:
   ... Any partner shall have the right to withdraw from the partnership at any time by serving written notice of intention to withdraw upon the other partners at the office of the partnership. The withdrawal shall become effective on the last day of the calendar month after service of the withdrawal notice hereafter referred to as the "date of withdrawal."

*Spartan* file to Tonkin & Mondl. On November 30, 1994, Sproehnle and Tonkin discussed the terms upon which Tonkin & Mondl would handle the *Spartan* appeal, agreeing to a contingency arrangement. Tonkin sent a letter to Neare, Gibbs & Company on December 9, 1994 confirming the telephone conversations in which Tonkin & Mondl agreed to represent Neare, Gibbs & Company for one-third (1/3rd) of the recovery obtained. The confirmation letter stated that Goldstein & Price's lien would be satisfied out of Tonkin & Mondl's contingency fee.

On December 8, 1994, the Seventh Circuit issued an order in the *Spartan* appeal, instructing the United States to obtain leave to file its notice of appeal out of time before December 23, 1994, to avoid dismissal. Tonkin & Mondl filed a motion to dismiss the *Spartan* appeal for lack of jurisdiction on January 27, 1995. On February 24, 1995, the United States filed a withdrawal of its appeal and the Seventh Circuit issued its order dismissing the appeal. Tonkin & Mondl devoted 35.25 hours to the *Spartan* appeal.

On April 3, 1995, Neare, Gibbs & Company received two checks totaling $1,471,965.09, payable to Spartan. Neare, Gibbs & Company filed an interpleader petition, which was granted. On February 9, 1996, Neare, Gibbs & Company deposited the sum of $488,162.03 (one-third of the recovery amount less attorney's fees and expenses in filing the interpleader action) into the registry of the court.

Out of the sum paid into the registry of the Court on the interpleader petition, the trial court allocated $463,162.03 to the firm of Goldstein & Price. The trial court then apportioned the amount earned by Goldstein & Price between the parties, awarding Tonkin 59% ($273,265.60) and Goldstein & Price 41% ($189,896.43). The trial court awarded $25,000.00 to Tonkin & Mondl. Finding Tonkin's effective date of withdrawal as December 31, 1994, the trial court further awarded Tonkin the sum of $6,028.75 on his counterclaim for breach of contract. The trial court dismissed with prejudice counterclaims III and IV, finding Goldstein & Price and its individual members did not act improperly after Tonkin's withdrawal and did not breach fiduciary

duties owed to Tonkin. Both parties appealed.

Appellate review of a court tried civil case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The judgment of the trial court will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.

### Dispute Between Law Firms

Goldstein & Price contends it satisfied the contingent fee agreement when it obtained a judgment for Neare, Gibbs & Company. Goldstein & Price argues that *Plaza Shoe Store, Inc. v. Hermel, Inc.*, 636 S.W.2d 53, 55 (Mo. banc 1982), sets out a bright line test, in which quantum meruit must be applied when an attorney is discharged without cause prior to obtaining a settlement or judgment, while an existing contract would be enforceable if an attorney is discharged without cause after reception of a settlement or judgment. Tonkin & Mondl argues Goldstein & Price did not satisfy the contingent fee agreement prior to discharge because no money had been collected on the judgment. Tonkin & Mondl, therefore, contends Goldstein & Price is now limited to a recovery based on quantum meruit.

In 1982, the Missouri Supreme Court revisited the attorney-client relationship, due in part to an increase in litigation and a corresponding growth in contingent fee contracts. *Plaza Shoe Store, Inc. v. Hermel, Inc.*, 636 S.W.2d 53, 56–57 (Mo. banc 1982). Acknowledging the absolute right of the client to discharge client's attorney at any time, with or without cause, the Missouri Supreme Court questioned the logic of recovering a fee under a contract despite a discharge prior to full performance. *Id.* at 58. "If the client has the right to discharge the attorney, then the contract of employment can no longer be entirely viable upon the exercise of that right." *Id.* The Missouri Supreme Court adopted the modern rule, "limiting the recovery of the attorney, [discharged prior to occurrence of the contingency], to the reasonable value of services rendered [quantum meruit], not to exceed the contracted fee, and

payable only upon the occurrence of the contingency." *Id.* at 60.

In *Plaza Shoe,* the attorneys representing Plaza Shoe Stores, Inc. obtained a reasonable offer and recommended acceptance to their client. After a disagreement, the attorneys terminated their employment contract with Plaza Shoe Stores, Inc. The attorneys filed a lien and after an eventual settlement, sought to recover on a contract entitling them to one-third of any and all amounts received by way of settlement.

█ *Plaza Shoe* found a proper recovery available to an attorney employed under a contingent fee contract and discharged without cause prior to settlement or judgment was quantum meruit, not to exceed the contracted amount. *Plaza Shoe* did not establish settlement or judgment as a bright line in all such disputes. A contingency fee arrangement is an employment contract. The client may terminate that contract at any time. *Plaza Shoe,* 636 S.W.2d at 58. The contract sets out the contingency. Contractual recovery is not proper if an attorney fails to fulfill the terms of the contingent fee contract with the client. *International Materials Corp. v. Sun Corp., Inc.,* 824 S.W.2d 890, 895 (Mo. banc 1992). The contingency set out in the contract triggers the obligation to pay the contracted fee. *Nangle v. Brockman,* 845 S.W.2d 619, 620 (Mo.App.1992).

█ We look to the contingency fee contract to determine whether Neare, Gibbs & Company discharged Goldstein & Price prior to satisfaction of the contingency. A contingency fee contract should be construed under the same rules of construction as apply to any other contract. *Smith v. Mann, Poger & Wittner, P.C.,* 882 S.W.2d 164 (Mo.App. 1994).

█ Goldstein & Price argues it completed the services for which it had been retained when it obtained a non-appealable judgment. We disagree. Goldstein & Price had to recover money by judgment or settlement to satisfy the contingency. Goldstein & Price argues the legal definition of "recovery" is "the restoration or vindication of a right existing in a person, by the formal judgment or decree of a competent court, at his instance and suit[.]" *Rosendale v. Market Square Dry Goods Co.,* 213 S.W. 169, 171 (Mo.App. 1919) (*quoting Black's Law Dictionary*); *Belfast Inv. Co. v. Curry,* 264 Mo. 483, 175 S.W. 201, 205 (1915) ("recover ... means to 'obtain a final judgment – to succeed in a lawsuit.'"). A judgment alone does not always vindicate the client's rights or restore money. In many instances the judgment will be appealed. In other instances, a final judgment may be impossible to collect. The language of the contract mandated collection to satisfy the contingency. The preposition "by" is defined as "through the means or instrumentality of." Webster's Third New International Dictionary 307 (15th ed.1966). The clause "by judgment or settlement" modifies the verb "recover", describing a means to achieve an end, monetary collection. Had the contract required only "recovery of judgment or settlement", or perhaps even "recovery", Goldstein & Price may have satisfied the contingency. The contract, however, required "monies recovered".

█ The trial court did not err in finding the contract language required recovery of money to satisfy the contingency. This interpretation of the contract is consistent with the presumption that an attorney undertaking litigation for a contingent fee, based on the amount recovered, contracts to carry the case entirely through until finish. *Creason v. Deatherage,* 325 Mo. 661, 30 S.W.2d 1, 4 (1930); *Knight v. DeMarea,* 670 S.W.2d 59, 62–63 (Mo.App.1984)("In the absence of an express provision to the contrary a contingent fee contract ... covers services rendered by the attorney in prosecuting or defending an appeal from a judgment in the case for which he is employed"). This means judgment must be obtained and collected. *Creason,* 30 S.W.2d at 4.

Neither Goldstein & Price nor Neare, Gibbs & Company considered the contingency fee due and owing until collection of the judgment. In fact, clients often enter into contingency fee contracts because they bear no risk of loss and cannot afford to pay an attorney prior to collection. *Curry v. Dahlberg,* 341 Mo. 897, 110 S.W.2d 742, 748 (1937). Goldstein & Price did not consider the contingency fee an account receivable, carry any

alleged obligation by Neare, Gibbs & Company on its books, or bill Neare, Gibbs & Company for the $488,162.03 it claims was owed. "Monies recovered" meant money actually collected. *See Barker v. H & J Transporters, Inc.,* 837 S.W.2d 537, 540–41 (Mo. App.1992) (finding the legislature intended the term "recovery" in Section 287.150.3 RSMo. Supp.1990 to mean money actually collected); *See also, Wainger v. Glasser & Glasser,* 250 Va. 220, 462 S.E.2d 62, 64 (1995) ("the fee is contingent upon a recovery of money, and is not ... contingent merely upon settlement or judgment").

Alternatively, Goldstein & Price argues it substantially performed all the work contemplated by the contract, entitling it to enforce the contract. *See Farrar v. Kelly,* 440 So.2d 939, 941 (La.Ct.App.1983); *See also* the annotation at 92 ALR3d 690, 709 captioned: "Limitation to Quantum Meruit Recovery, Where Attorney Employed Under Contingent Fee Contract is Discharged Without Cause." Tonkin & Mondl argues Missouri does not recognize the doctrine of "substantial performance" in this context. We need not come to such a conclusion.

■ There was substantial evidence for the trial court to find Goldstein & Price had not substantially performed prior to discharge. At the time of discharge, an appeal was pending in the Seventh Circuit. The thirty days provided in the Federal Rules of Appellate Procedure for the government to seek leave to file the Notice of Appeal out of time had not expired. In fact, the appeal was not dismissed until three months after discharge. After discharge, the client retained Tonkin & Mondl to ensure dismissal of the appeal, collection of the judgment, and pursuit of the claim of entitlement to interest on the judgment.

■ We view the trial court as an expert on the subject of attorney fees. *Trapani v. Trapani,* 686 S.W.2d 877, 878 (Mo.App.1985). The trial court considers the time, nature, character and amount of services rendered, nature and importance of litigation, degree of responsibility imposed upon or incurred by the attorney, the amount of money or property involved, degree of professional ability, skill and experience called for and used, and

result achieved. *Reid v. Reid,* 906 S.W.2d 740, 743 (Mo.App.1995). The trial court is equally qualified to determine the value of appellate services. *Trapani,* 686 S.W.2d at 878. The trial court did not err in determining Goldstein & Price had not substantially performed at the time of discharge, because of the need for additional work on appeal.

■ The trial court did not err in awarding Goldstein & Price $463,162.03 under quantum meruit. Again, we must mention the trial court sits as an expert in consideration of attorney fees due after consideration of all relevant factors. *Roberds v. Sweitzer,* 733 S.W.2d 444, 447 (Mo. banc 1987). We will not reverse this discretionary act unless the award is so arbitrary or unreasonable that it indicates indifference and lack of proper judicial consideration. *Estate of Strauss v. Schaeffer,* 781 S.W.2d 274, 275 (Mo.App.1989). While the fee awarded greatly exceeded Goldstein & Price's hourly rates multiplied by the number of hours spent on the case, the decision does not indicate indifference or lack of proper discretion. The time taken to perform the services is only one element considered, and usually of minor importance. *Scott v. Home Mut. Tel. Co.,* 510 S.W.2d 793, 795 (Mo.App.1974). In addition to the factors listed in the above paragraph, the trial court may look at the contingency or certainty of compensation and whether acceptance of employment involved loss of other employment. *German Evangelical St. Marcus Congregation of St. Louis v. Archambault,* 404 S.W.2d 705, 711 (Mo.1966). The trial court did not abuse its discretion.

■ The trial court applied quantum meruit in determining how to split the contingency between the firms. The trial court awarded Tonkin & Mondl $25,000 for legal services. Goldstein & Price argues this sum was unreasonable, considering the services rendered were of little or no value. The trial court did not err in awarding $25,000 to Tonkin & Mondl. Goldstein & Price argues this award is arbitrary, excessive, and lacks support in the record. *Reid v. Reid,* 950 S.W.2d 289, 291 (Mo.App.1997). Tonkin &

Mondl entered a contingency fee contract with Neare, Gibbs, & Company. Unlike Goldstein & Price, Neare, Gibbs & Company did not discharge Tonkin & Mondl prior to the occurrence of the contingency. Therefore, the contract is controlling.

Tonkin & Mondl agreed to represent Neare, Gibbs & Company on a one-third contingency fee basis, and any fee payable to Goldstein & Price was to be paid out of the contingency fee payable to Tonkin & Mondl. On April 3, 1995, Neare, Gibbs & Company received checks totaling $1,471,965.09 in partial satisfaction of the judgment. Neare, Gibbs & Company filed an interpleader petition and deposited a sum of $488,162.03 into the registry of the court. Subtracting Goldstein & Price's award from the deposited sum results in a fee of $25,000 for Tonkin & Mondl. The quantum meruit fee due Goldstein & Price and the contingency fee due Tonkin & Mondl both became payable upon recovery of the money. *See Plaza Shoe Store, Inc.*, 636 S.W.2d at 60.

■ The trial court awarded $25,000 as compensation for "the time and effort required to ensure termination of the action, collection of the judgment, and pursuit of the claim of entitlement to interest on the judgment." The trial court also found if additional work is required, no additional compensation would be payable unless Tonkin & Mondl recovered additional sums. The award is not unreasonable or excessive. Whether based on contract or quantum meruit, the award is supported by the record. We find no error.

### Division of the Goldstein & Price Fee

The trial court found that because the fee "was an obligation owed severally to the members of Goldstein & Price and Tonkin, it follows that the fee should be apportioned in accordance with the actual contribution of each lawyer to the eventual result." Applying quantum meruit, the trial court awarded Tonkin 59% of the Goldstein & Price fee because operating expenses provided by Goldstein & Price amounted to approximately 41% of the operating revenue and Tonkin had performed the majority of the work. The trial court erred.

■ Under the Missouri Limited Liability Company Act, the parties' operating agreement governs this dispute. "The profits or losses of a limited liability company shall be allocated among the members and among classes of members, in the manner provided in the operating agreement." Section 347.111 RSMo.1994. If the business of a limited liability company ("L.L.C.")" continues following withdrawal of a member, the withdrawing member shall be entitled to receive any distributions to which he is entitled upon withdrawal under the provisions of the operating agreement. Section 347.103.2 RSMo. 1994. Moreover, quantum meruit has no application when an express agreement governs the parties' rights and obligations. *Krupnick & Associates v. Hellmich*, 378 S.W.2d 562, 568 (Mo.1964).

■ The operating agreement contained a withdrawal provision specifically addressing a withdrawing member's entitlement to fee income. Under the agreement, Tonkin was entitled to reimbursement of his capital contribution to the firm and to 13.05% of the L.L.C.'s accounts receivable, defined as "statements for fees billed to clients and unpaid." The operating agreement contained provisions for payment of a percentage of work in progress to retiring partners and in the case of the death of a partner. However, there was no provision for payment of a percentage of work in progress to a withdrawing partner.

Under the trial court's ruling, because Tonkin left Goldstein & Price, he received nearly 46% more of the profits from Goldstein & Price's *Spartan* fee than he would have received had he stayed at Goldstein & Price. This finding is contrary to the operating agreement. Moreover, it ignores the nature of the L.L.C. Under Goldstein & Price's arrangement, the attorneys shared profits and losses as set out in the agreement. The attorneys shared the risk. While Tonkin spent a significant amount of time on the *Spartan* case as both a partner and member of Goldstein & Price, he was entitled to regular distributions prior to his departure, despite the outcome in the *Spartan* case.

The trial court erred in awarding Tonkin 59% of the fee awarded Goldstein & Price.

■ We look to the operating agreement for determination of Tonkin's recovery from the fee awarded Goldstein & Price. The operating agreement defines an "account receivable" as "all statements for fees billed to clients and unpaid." Goldstein & Price did not bill Neare, Gibbs & Company prior to Tonkin's departure from Goldstein & Price. The *Spartan* fee does not fall within the definition of "account receivable" set out in the operating agreement. We cannot look at the parties subsequent actions to construe this operating agreement that is clear and unambiguous. *See Leggett v. Missouri State Life Ins. Co.,* 342 S.W.2d 833, 851 (Mo. banc 1960). A clear and unambiguous contract must be enforced in accordance with its terms. *Id.* The members of Goldstein & Price, including Tonkin, adopted an agreement that did not include work in progress under the withdrawal provisions, unlike the death and retirement provisions. Under the partnership agreement adopted as the operating agreement, Tonkin was entitled to no portion of the *Spartan* fee paid to Goldstein & Price.

We find, however, that the parties modified the operating agreement regarding the *Spartan* fee. Several witnesses testified that the members of the L.L.C., including Tonkin, orally agreed to treat the portion of the *Spartan* fee awarded to Goldstein & Price like an account receivable. The existence of the oral agreement to treat the *Spartan* fee like an account receivable is further evidenced by Goldstein & Price's attempts to pay Tonkin 13.05% of the fee. Additionally, the firm treated the *Spartan* fee as an account receivable for member Jeanne Knowles Townsend when she went on a maternity leave of absence.

■ The modification of a contract constitutes the making of a new contract. *E.A.U., Inc., v. R. Webbe Corp.,* 794 S.W.2d 679, 686 (Mo.App.1990). Like any other agreement the modification is enforceable

only if based upon mutual assent and supported by consideration. *Id.* The members of Goldstein & Price agreed that they would treat the *Spartan* fee like an account receivable. Any member could benefit from this agreement. We find substantial evidence in the record to support modification of the operating agreement for purposes of dealing with the *Spartan* fee only. Under the operating agreement as modified, Tonkin was entitled to 13.05% of the portion of the *Spartan* fee received by Goldstein & Price. We reverse and remand with instructions for further proceedings consistent with this opinion.

## Effective Withdrawal Date

Goldstein & Price contends the trial court erred in finding Tonkin's withdrawal as a member of Goldstein & Price was effective December 31 rather than November 30, entitling Tonkin to $5,162.49 plus interest.[2] We agree.

Section 12 of the controlling agreement provides in relevant part:

> Any partner shall have the right to withdraw from the partnership at any time by serving written notice of intention to withdraw upon the other partners at the office of the partnership. The withdrawal shall become effective on the last day of the calendar month after service of the withdrawal notice hereinafter referred to as the "date of withdrawal" ...

Section 12 of the agreement further provides that a withdrawing partner receive his or her share of capital in six equal monthly installments, "with the first payment due on the thirtieth day following the service of the notice of withdrawal and the remaining payments due on the same day of each month thereafter until fully paid."

■ Interpretation of a contract is a question of law, which this Court reviews de novo. *Leggett v. Missouri State Life Ins. Co.,* 342 S.W.2d 833, 850 (Mo. banc 1960). The fundamental principle of contract interpretation is to ascertain the intention of the parties and give effect to it. *Peterson v.*

---

**2.** These damages represent Tonkin's additional share of accounts receivable and capital in the amount of $3,162.49 plus the $2,000.00 contribu-

tion he would have made to his Keogh account in December 1994.

*Continental Boiler Works, Inc.,* 783 S.W.2d 896, 901 (Mo. banc 1990). If possible the contract should be construed to give a reasonable meaning to all its provisions. *Harris v. Union Electric Co.,* 622 S.W.2d 239, 248 (Mo.App.1981).

Goldstein & Price argues section 12 means the withdrawal shall become effective on the last day of the same calendar month in which service of the withdrawal notice is given because section 12 only refers to one calendar month. Tonkin argues the use of the word "after" in section 12 defines the date of withdrawal as the last day of the calendar month after the calendar month during which written notice is provided. Whether language is ambiguous or not is a question of law. *Harris,* 622 S.W.2d at 247 (Mo.App.1981). Mere disagreement over the meaning of a contract does not signal an ambiguity. *Id.* However, language susceptible of interpretation in opposite ways is ambiguous. *Leggett,* 342 S.W.2d at 852.

We "seek to ascertain the intent of the parties by giving to the language used its natural, ordinary, and common sense meaning." *Wilshire Const. Co. v. Union Elec. Co.,* 463 S.W.2d 903, 906 (Mo.1971). "After" is used as a preposition, meaning "subsequent to and in consequence of". Webster's Third New International Dictionary 38 (15th ed.1966). Reading only the sentence in question, we cannot determine what effect the parties intended the preposition "after" to have. Viewing this sentence in isolation, more than one reasonable interpretation can be gleaned from the contract language. *Harris,* 622 S.W.2d at 247. A reasonable construction is that the parties intended "after" to mean the last day of the month in which the member provided written notice, which would be subsequent to the day the member provided written notice. However, the parties may have intended "after" to mean the last day of the calendar month subsequent to the calendar month in which the member provided written notice. Therefore, the trial court erred in finding the sentence unambiguous, meaning the last day of the calendar month after the calendar month in which the member provided written notice.

In construing the operating agreement, this court will give effect to all parts of the instrument. *Harris,* 622 S.W.2d at 248. "[A] construction that gives a reasonable meaning to all its provisions will be preferred to one that leaves a portion of the writing useless or inexplicable." *Id.* We cannot look outside the operating agreement unless the sentence in question remains ambiguous after viewing the entire contract. *E.g. Wilshire Const. Co.,* 463 S.W.2d at 906. Additionally, this Court may consider the object, nature and purpose of the agreement. *Id.*

The last sentence of section 12 states that "[t]he partnership books shall be closed on the date of withdrawal in the regular way and the withdrawing partner shall be paid for his/her interest in the partnership" according to the terms of subsection 12(a). Subsection 12(a) requires a withdrawing member's capital be paid in six equal monthly installments "... with the first payment due on the 30th day following the service of the notice of withdrawal ..." Both Goldstein & Price and Tonkin agree that Tonkin's first capital payment was due on December 22, 1994.

The purpose of section 12 was to provide a quick and efficient means of fairly terminating membership after notice of withdrawal. Section 12 attempts to hasten the departure of members who sever their relationship with the L.L.C., to avoid the tension and conflict their continued presence may cause. After viewing the operating agreement as a whole, the sentence in question can most reasonably be construed to mean the withdrawal is effective on the last day of the calendar month in which service of notice is provided. It would have been impossible to carry out the required payout to Tonkin as a departing member in accordance with the agreement if his withdrawal became effective on December 31. A member's capital account fluctuates daily until his withdrawal becomes effective and the books close. Goldstein & Price could not calculate the six equal installments, beginning on December 22, if involvement with the L.L.C.'s profits and losses continued until December 31.

The trial court accepted Tonkin's argument that Goldstein & Price could estimate Tonkin's first installment. The operating agreement does not call for an "estimated" first installment. "An interpretation of a contract that creates an unreasonable result, when a more probable and reasonable construction can be adopted will be rejected." *C.B. Commercial Real Estate Group, Inc. v. Equity Partnerships Corp.*, 917 S.W.2d 641, 647 (Mo.App.1996). The construction of the trial court does not promote the object, purpose, and nature of the agreement. We find, after viewing the operating agreement as a whole, that the operating agreement unambiguously mandated November 30 [th] as the effective date of withdrawal.

Goldstein & Price's construction allows a withdrawing member up to a month after written notice, depending on the withdrawing member's needs. The L.L.C. can properly close the books at the end of that month, perform an audit, and begin making capital account installments, in accordance with subsection 12(a), thirty days after the member provided written notice, without estimating.

Tonkin contends that such a construction of this provision encourages withdrawal while "running out the door". However, no Missouri case, statute, or rule of professional conduct holds that an operating agreement which permits withdrawal upon thirty days notice or less is illegal, improper, or unethical. The membership, including Tonkin, agreed to the operating agreement. Moreover, Tonkin controlled his own effective date of withdrawal by the timing of his notice. Goldstein & Price did not breach the operating agreement by forcing Tonkin's withdrawal. We reverse the trial court's finding that $5,162.49 plus interest be awarded Tonkin as damages arising out of Goldstein & Price's breach.

Resolution of the effective date of withdrawal as November 30, 1994 moots Goldstein & Price's fifth point on appeal, contending the trial court's award of $2,000.00 for "the contribution of [Tonkin's] Keogh account which would have been made in December, 1994" is unsupported by substantial evidence.

## Cross Appeal

Tonkin & Mondl and Tonkin ("cross-appellants") appeal, arguing the trial court should have awarded Goldstein & Price less because of allegedly improper conduct after Tonkin announced his withdrawal. Additionally, cross-appellants appeal from the decision of the trial court not to grant them damages arising out of claims for breach of fiduciary duty.

We must review the evidence in the light most favorable to the prevailing party. *Meyer v. Lofgren*, 949 S.W.2d 80, 82 (Mo.App. 1997). We give the prevailing party the benefit of all reasonable inferences and disregard the other party's evidence except as it supports the judgment. *Id.* Fact issues are found in accordance with the result reached. *Id.*

▮ The trial court rejected cross-appellants' claims. The trial court found no evidence that Goldstein & Price acted maliciously or outrageously. Additionally, the trial court found that "[b]oth sides developed and acted upon considered legal judgments in light of existing circumstances" and that Goldstein & Price and its individual members acted in "good faith". The trial court found Goldstein & Price did not conceal assets, interfere with client relationships, defame members of Tonkin & Mondl, or act in other ways that would warrant a finding of breach of fiduciary duty. The record supports the factual findings of the trial court. An extended opinion would have no precedential value. Points denied.

## Summary

In summation, we affirm the trial court's quantum meruit determination of the Goldstein & Price fee as well as the trial court's award to Tonkin & Mondl, which we find consistent with its contingency fee agreement. We find the trial court erred in awarding Tonkin a percentage of the Goldstein & Price fee in excess of the amount set out in the company's controlling operating agreement. We reverse and remand with instructions for further proceedings consistent with this opinion. We reverse the trial court's award of damages flowing from an

erroneous finding that Goldstein & Price breached the operating agreement in forcing Tonkin's early withdrawal. We affirm the trial court's determination that Tonkin & Mondl's and Tonkin's claims of allegedly improper conduct and breach of fiduciary duty are meritless.

Judgment affirmed in part, reversed in part and reversed and remanded in part for further proceedings consistent with this opinion.

KAROHL, and PUDLOWSKI, JJ., concur.